**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 22, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KATHLEEN MILLIGAN-HITT and
KATHRYN R. ROBERTS,

       Plaintiffs-Appellees/
       Cross-Appellants,

      v.

BOARD OF TRUSTEES OF
SHERIDAN COUNTY SCHOOL
DISTRICT NUMBER 2, CRAIG
DOUGHERTY, in his individual and
official capacities as Superintendent,
and TERRY BURGESS, in his official
capacity as Assistant Superintendent,

       Defendants-Appellants/
       Cross-Appellees.

Nos. 06-8086 & 06-8087

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. NO. 05-CV-0017B)**

---

Michael K. Davis (Kendal R. Hoopes with him on the briefs), Yonkee & Toner,
LLP., Sheridan, Wyoming, for Defendants-Appellants Board of Trustees and
Official-Capacity Defendants.

Jeremiah A. Collins, Bredhoff & Kaiser, P.L.L.C., Washington, D.C. (Joshua B.
Schiffrin, Bredhoff & Kaiser, P.L.L.C., Washington, D.C., Gregory P. Hacker,
Patrick E. Hacker, and Erin Maureen Kendall, Cheyenne, Wyoming, with him on
the briefs), for Plaintiffs-Appellees/Cross-Appellants.

Kate M. Fox, Davis & Cannon, Cheyenne, Wyoming for Defendant-Cross-Appellee Craig Dougherty in his Individual Capacity.

Before **TACHA**, **HARTZ** and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

A Wyoming jury found that a school superintendent in Sheridan County had unconstitutionally discriminated against two administrators. The judge allowed the jury to award damages for the superintendent's conduct against the school district but not against the superintendent himself. Both the plaintiffs and the school district have appealed, requiring us to decide the scope of municipal liability and qualified immunity under 42 U.S.C. § 1983. We conclude that the superintendent was not the final policymaker for the district, and therefore that the district is not liable to pay for his wrongdoing. We also conclude that in early 2003, the discrimination at issue here—on the basis of sexual orientation—was not clearly established to be unconstitutional, and therefore that qualified immunity protects the superintendent from personal liability as well. Thus, the plaintiffs are not entitled to damages against any of the defendants in this lawsuit.

## I. BACKGROUND

Kathleen Milligan-Hitt and Kathryn Roberts lived and worked together in Sheridan, Wyoming. Ms. Milligan-Hitt worked as an assistant principal at an 8th- and 9th-grade junior high school; Ms. Roberts was the principal of the 6th- and

7th-grade middle school there. Both were employed under a series of one-year contracts. Before moving to Sheridan, they had lived in Rock Springs, where their personal relationship began.

In May, 2002, Ms. Milligan-Hitt and Ms. Roberts accompanied a school field trip to Montana. Afterward, Superintendent Craig Dougherty received a complaint from parents who told him that their daughter had seen the couple holding hands and walking into a Victoria's Secret store. Ms. Milligan-Hitt and Ms. Roberts later testified that this account was false, and Mr. Dougherty also acknowledged that it did not "sound like a likely story." App. 622. Nonetheless, that fall he discussed the complaint with each of them because, he said, he "wanted to let them know that this [complaint] had occurred." *Id.*

The content of these discussions was disputed at trial. According to Ms. Roberts, Mr. Dougherty called her into her own office (where he was sitting in her chair) and told her about the complaint. After she denied the incident, Mr. Dougherty responded "that he had called Rock Springs and he knew all about the two of [them]." App. 732. She testified that he was angry, and that his face was red and his voice slightly raised. Ms. Milligan-Hitt testified to a similar conversation: Mr. Dougherty also told her, "I called Rock Springs and I know all about you two." App. 303. He was angry and red-faced during this version of the conversation as well, and she felt that her "job could be in jeopardy." App. 309. In contrast, Mr. Dougherty testified that he was not upset during these

-3-

conversations, did not mention Rock Springs, and told Ms. Roberts that her sexual orientation "would never be an issue" so long as he was superintendent. App. 624.

Matters rested there until 2003, when the construction of a new school building and a reorganization of grades meant that several administrative positions would be moved or eliminated. Instead of one school for grades six and seven and one for grades eight and nine, there was to be a single sixth-, seventh-, and eighth- grade middle school. Ninth grade was moved to the high school. Administrators at the eliminated schools, including Ms. Milligan-Hitt and Ms. Roberts, as well as some administrators at the high school, were required to submit applications and compete for positions at the new school.

Over the first half of 2003, Ms. Milligan-Hitt and Ms. Roberts both applied for jobs as assistant principals at the high school, and as principal and assistant principal at the new middle school. Ms. Milligan-Hitt also applied for a job as elementary school principal. These applications did not go well. For the position as principal at the new middle school, Ms. Roberts testified that she "interviewed poorly for the position." App. 949. Ms. Milligan-Hitt testified that her interview was "[l]ess than adequate." App. 433. After the interview, no member of the hiring committee voted for Ms. Roberts. Oddly, in light of their status as the sole individually named defendants, Mr. Dougherty and his assistant Terry Burgess were Ms. Milligan-Hitt's only supporters on the committee; each listed her as his

second choice. The committee recommended Scott Stults, who had been principal of the district's Highland Park Elementary School, lauded for its extremely high standardized test scores. The school district's board of trustees hired him on the committee's recommendation. To select Mr. Stults's assistant principal, the committee told Mr. Stults to interview the three applicants—Ms. Milligan-Hitt, Ms. Roberts, and Ms. Roberts's assistant, Mr. Kadera. After the interviews, Mr. Stults selected Mr. Kadera. Plaintiffs' applications for two positions as assistant principal at the high school were also unsuccessful. Ms. Milligan-Hitt acknowledged that she was less qualified than the assistant principals who were selected, and Ms. Roberts had "no significant complaints" about the process. App. 969.

Finally, Ms. Milligan-Hitt unsuccessfully applied to be principal of Highland Park Elementary School—Mr. Stults's previous job. Out of 16 or 17 applications, Mr. Burgess gave 10 to 12 of those, including Ms. Milligan-Hitt's, to the hiring committee. Mr. Dougherty testified that her application "was the exact same" as the one she had submitted unsuccessfully for the middle school, and that she had not given "an indication about why she wanted to be at" the elementary school. App. 551–52. Mr. Burgess testified that he "stayed neutral" on whether to interview her, and the committee decided not to. App. 1084. The district hired Ms. Roberts to teach physical education for a year and the two later moved to Lander, Wyoming, and found work at schools there.

In October 2006, they filed this lawsuit under 42 U.S.C. § 1983 and the Fourteenth Amendment against the board of trustees of the school district, Mr. Dougherty in his individual and official capacities, and assistant superintendent Terry Burgess in his official capacity. The suit against Mr. Dougherty in his personal capacity was dismissed on summary judgment on the basis of qualified immunity. Although the district court found that there were genuine issues of material fact as to whether Mr. Dougherty's actions had been unconstitutional, it held that the law governing discrimination on the basis of sexual orientation had not been clearly established in 2002 and early 2003, before the Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558 (2003), which arguably clarified the issue.

The other claims were all construed as a suit for municipal liability against the school district, to which qualified immunity does not apply. It proceeded to trial. The district court instructed the jury that it could decide, as a factual matter, that the district had delegated its policymaking authority to Mr. Dougherty, in which case his conduct could subject the municipality to liability. After receiving this instruction, the jury found that the school district had violated the equal protection clause and awarded total damages of $160,515. The jury found no liability on the plaintiffs' other claims, such as for violation of their rights to intimate association.

The school district appealed the verdict to this Court. Ms. Milligan-Hitt and Ms. Roberts cross-appealed the grant of summary judgment for Mr. Dougherty.

## II. MUNICIPAL LIABILITY AND POLICYMAKING AUTHORITY

While § 1983 allows suits against individual state officials who have violated their constitutional rights, plaintiffs frequently wish to seek damages further up the chain of command. Officials sued personally are shielded by qualified immunity, meaning that they are liable for damages only where they had fair warning of the illegality of their conduct. Even when held liable they do not always have the money or the insurance to pay large judgments against them. The municipalities that employ them have more money and no immunity, so they are tempting targets for lawsuits when municipal officials have erred. Section 1983, however, rejects the tort principle of *respondeat superior* and does not subject municipalities to vicarious liability for the acts of their employees; municipal taxpayers are liable only for the municipality's own misdeeds. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–95 (1978).

Federal law forces municipal taxpayers to pay damages for official actions through municipal liability only if those "edicts or acts may fairly be said to represent official policy" of the district. *Id.* at 694. Because the Sheridan County School District had no official policy of sexual-orientation discrimination, these plaintiffs must show that their rights were violated by one of the district's final

policymakers. *Simmons v. Uintah Health Care Special Serv. Dist.*, 506 F.3d 1281, 1284–85 (10th Cir. 2007). Although the board made the final decision not to hire Ms. Milligan-Hitt and Ms. Roberts, the plaintiffs contend that final policymaking authority over the hiring decisions was delegated to the superintendent, who exercised it in an intentionally discriminatory manner. The plaintiffs do not contend that the hiring committees themselves were discriminatory, apart from any involvement from the superintendent. The district court treated the superintendent's policymaking authority as a question of fact and presented it to the jury, which concluded that Mr. Dougherty was the final policymaker of the district.[1] We must reverse this judgment because the question of Mr. Dougherty's final policymaking authority is a question of law, which should not have gone to the jury. The district court should have concluded that as a matter of law, Mr. Dougherty did not make district hiring policy.[2]

---

[1] The jury's special verdict form does not make this clear, but we can infer that this must have been the jury's conclusion because the evidence was insufficient for a rational trier of fact to find discrimination by the school board itself, as we discuss below. The plaintiffs also relied exclusively on this theory during their closing argument

[2] Because we find in the district's favor on this ground, we need not consider a challenge it raises on appeal to a different jury instruction, which allowed the jury to consider inconsistent testimony as evidence of discriminatory intent.

## A. Adjudicating Policymaking Authority

The judge, not the jury, should determine who exercises final policymaking authority in a municipality. This issue was settled by the Supreme Court's decision in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736–38 (1989). In *Jett*, the Supreme Court held that allowing a jury to decide whether a school's principal and superintendent could have been delegated final policymaking authority was "manifest error." *Id.* at 736. The Court explained that it was incorrect to give this issue to a jury because the identity of those final policymakers whose conduct can create municipal liability is "'a question of *state law*.'" *Id.* at 737 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion)). It thus concluded that "the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury." *Id.* at 737. Therefore, jury instructions regarding policymaking authority are inappropriate because the judge, not the jury, "identifi[es] those officials" whose wrongs can create municipal liability. *Id*.

In adopting this standard, *Jett* expressly rejected as unworkable the view the plaintiffs now advance. During the previous term in *City of St. Louis v. Praprotnik*, the Court failed to produce a majority opinion explaining how final policymaking authority should be determined. Justice Brennan had argued in a concurring opinion that determinations of municipal liability should be based on

-9-

"the realities of municipal decisionmaking," which would entail a "factual and practical" inquiry into "a municipality's actual power structure." 485 U.S. at 145 (Brennan, J., concurring in the judgment). The plurality, however, rejected Justice Brennan's view, explaining that it would be "capricious . . . to hold a municipality responsible for every decision that is perceived as 'final' through the lens of a particular factfinder's evaluation of the city's 'actual power structure.'" *Id*. at 124 n.1. The plurality went on to say that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Id.* at 126. In *Jett*, the Court explained that it had taken the case "to clarify the application of our decisions in *St. Louis v. Praprotnik* and *Pembaur v. Cincinnati* to the school district's potential liability for the discriminatory actions of [a principal]." 491 U.S. at 710–11 (internal citations omitted). A majority then adopted the plurality opinion in *Praprotnik* and squarely rejected the alternative of letting factfinders decide where final policymaking authority lies. *Id.* at 737–38.

This rule is true to the logic of *Monell*. Because municipalities are responsible only for their own misdeeds, municipal taxpayers are liable only for those official actions that "represent" the municipality in a legal sense. *Monell*, 436 U.S. at 694. By ensuring that liability follows *legal* authority, *Jett* provides incentives for cities to give final authority only to responsible officials. Moreover, if municipal liability depended on the unpredictable results of a case-

by-case analysis of the "actual power structure" of each municipality sued, cities might be forced to insure broadly against potential misconduct by every significant official. The *Jett* rule is more predictable and depends on a factor largely controlled by the city—law. *See Praprotnik*, 485 U.S. at 124 n.1 ("Municipalities cannot be expected to predict how courts or juries will assess their 'actual power structures,' and this uncertainty could easily lead to results that would be hard in practice to distinguish from the results of a regime governed by the doctrine of *respondeat superior*."). Thus *Jett* ensures that cities are held liable only for their own choices about where to vest authority, as *Monell* requires, not forced to provide "'mutual insurance'" against unforeseeable usurpations of power, as *Monell* forbids. *Monell*, 436 U.S. at 694 (quoting Cong. Globe, 42d Cong., 1st Sess. 792 (1871) (statement of Rep. Butler)).

To be sure, as both *Jett* and *Praprotnik* acknowledged, this rule could in some cases allow a municipality to use legal forms to hide the function of its true policies. But the Supreme Court concluded that there is a different mechanism for guarding against this risk: allowing plaintiffs to hold a municipality liable not only for the actions of its legal policymakers but also for its unwritten customs and policies. As *Praprotnik* put it: "whatever analysis is used to identify municipal policymakers, egregious attempts by local government to insulate themselves from liability for unconstitutional policies are precluded *by a separate doctrine*. . . . [T]he Court has long recognized that a plaintiff may be able to

-11-

prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'"  485 U.S. at 127 (emphasis added) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 68 (1970)) (further internal quotation marks omitted).  This doctrine is not at issue here.

Our Circuit has repeatedly adhered to *Jett*'s holding.  In *Ware v. Unified School District No. 492*, 902 F.2d 815 (10th Cir. 1990), decided the year after *Jett*, we held that, as a matter of law, a Kansas superintendent was not the final policymaker of the school district.  Because of the "Supreme Court's admonition that the identification of final decisionmakers must be done as a matter of law," we refused to consider "evidence in the record" that "could be construed to support an inference that the board delegated its final authority."  *Id.* at 819 n.1.  Similarly, in *Jantz v. Muci*, 976 F.2d 623 (10th Cir. 1992), we rejected a claim that a Kansas school principal, rather than the school board, had final policymaking authority over hiring decisions.  We noted that while the district court found the principal to have "virtual de facto hiring authority," the court "did not discuss Kansas law," and we reversed its decision.  *Id.* at 631.

Despite the weight of this authority, the plaintiffs argue that this Circuit's decision in *Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995), establishes that juries can sometimes determine who has final policymaking authority.  In *Randle*, we held that a liquor licensing assistant fired by the City of Aurora might

be able to hold the city liable for the allegedly discriminatory actions of the city's manager, finance director, and human resources director, because it was unclear whether those officials were the city's final policymakers. *Id.* at 444. In analyzing the issue, *Randle* confirmed that "final policymaking authority is a legal issue to be determined by the court." *Id.* at 448 (internal quotation marks omitted). However, we refused to decide whether the city officials sued in that case had been delegated policymaking authority, because "disputes of material fact . . . preclude[d] a grant of summary judgment for the City." *Id.* at 449. This disposition might seem to imply that issues of fact could be relevant to identifying officials with final policymaking authority. Thus, the plaintiffs argue, the "identification of those officials whose decisions represent the official policy of the local governmental unit," *Jett*, 491 U.S. at 737, may sometimes be resolved by the jury as a factual issue.

In light of the governing precedent and the details of the case, we do not think that the reference to "material fact" in *Randle* should be read so expansively. Another reading is equally plausible and would be more consistent with Supreme Court precedent. After the *Randle* opinion referred to a "dispute[] of material fact," 69 F.3d at 449, it went on to describe a dispute that was legal, not factual. The decision explained that Ms. Randle's claim survived summary judgment because provisions in the City of Aurora's charter and a city personnel policy appeared to "grant the City Manager full authority over personnel policies .

. . and . . . prevent the City Council from any involvement in employment decisions." *Id.* at 449. The Court then acknowledged that the manager's authority could in theory be restrained by city council regulations, but noted that no such regulations had been mentioned in the record or in the city's brief. *Id.* at 449–50. On the basis of these three documents alone—the charter, personnel policy, and the absence of any regulations—the Court remanded the issue for further proceedings of an unspecified form.[3]

The charter, policy, and regulations are all essentially legal documents. Our prior cases analyzing municipal liability under *Jett* and *Praprotnik* have treated city ordinances as law. *See, e.g.*, *Melton v. Oklahoma City*, 879 F.2d 706, 724 (10th Cir. 1989). Indeed, we regularly read and apply city ordinances, not in the record, just as we do federal and state statutes. *Id.* (city ordinance); *United States v. One (1) 1975 Thunderbird*, 576 F.2d 834, 836 (10th Cir. 1978) (state statutes); *United States v. Van Buren*, 513 F.2d 1327, 1328 (10th Cir. 1975) (federal statute); *Jackson v. Denver Producing & Ref. Co.*, 96 F.2d 457, 460 (10th Cir. 1938) (city ordinance).[4] Similarly, the *Randle* Court noted that the personnel

---

[3] The case settled shortly after remand. *See Randle v. City of Aurora*, No. 92-cv-2528 (D. Colo., filed Dec. 23, 1992), docket nos. 76, 77. Thus, no further factfinding was ever conducted.

[4] It is true that we sometimes describe our treatment of municipal law as "judicial notice" pursuant to the Federal Rules of Evidence, *see, e.g.*, *Melton*, 879 F.2d at 724 & n.25, even though the Rules "govern[] only judicial notice of adjudicative facts." Fed. R. Evid. 201(a). *See also Id.*, 1972 Advisory Comm.'s

(continued...)

policy had apparently been incorporated by the city charter. *Randle*, 69 F.3d at 449 (quoting Charter of City of Aurora, § 7–4 (b)). *Jett* made clear that for purposes of municipal liability, municipal ordinances and regulations are not facts to be scrutinized by lay juries but rather legal documents whose contents should be applied by judges. Thus, when the Court in *Randle* turned to an analysis of the city charter, regulations, and official personnel policy, we do not think it intended to contradict its earlier statement that "final policymaking authority is a legal issue to be determined by the court." 69 F.3d at 447 (internal quotation marks omitted). Instead, *Randle* recognized what the Supreme Court held—that final policymaking authority must be determined by a judicial examination of state and local law, not turned over to the jury.

## B. Superintendent Dougherty Was Not the Final Policymaker

We have concluded that the instruction authorizing the jury to determine who was the final policymaker for these hiring decisions was erroneous. Our inquiry, however, cannot end there. If as a matter of law Mr. Dougherty *was* the

---

[4](...continued)
Notes ("[T]he manner in which law is fed into the judicial process is never a proper concern of the rules of evidence but rather of the rules of procedure.").

It does not matter for this case whether our comments implying that this "judicial notice" is conducted pursuant to the Federal Rules of Evidence are correct. Whether an issue is "factual" or "legal" for purposes of the federal rules does not conclusively establish whether it is to be resolved by the judge or the jury in a § 1983 suit. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 377–78 (1996); *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 708, 718–720 (1999) (applying *Markman* doctrine to § 1983 cases). As we have explained, *Jett* has settled the issue for us here.

-15-

final policymaker, then submitting the issue to the jury may have been inconsequential because the correct procedure would have yielded the same answer. However, we conclude that Mr. Dougherty did not exercise such authority, and therefore that the municipality is not liable for any discrimination he may have committed.[5]

Under Wyoming law, the Board of Trustees is vested with the authority to make personnel decisions. The statute governing school trustees gives them the power to "[e]mploy and determine the salaries and duties of" superintendents, principals, teachers, and all other school personnel. Wyo. Stat. Ann. § 21-3-111(a)(vi). The plaintiffs do not dispute this, but argue that because the school board did not adequately supervise Mr. Dougherty, it delegated this authority to him and gave him the school board's status as final policymaker. In light of the legal—not factual—nature of the municipal liability inquiry, however, we are interested only in delegations of *legal power*, not in whether the board's actual exercise of its power of review was sufficiently aggressive. *See Jantz*, 976 F.2d at 631. With this in mind, we conclude that the board's delegation of administrative power to the superintendent did not turn him into the final policymaker.

---

[5] The plaintiffs also argue that Mr. Dougherty may have delegated some of *his* status as delegated policymaking authority to his assistant, Terry Burgess. Because we conclude that Mr. Dougherty had no such status to delegate, we necessarily conclude that Mr. Burgess lacked final policymaking authority too.

The school board has adopted a policy entitled "Board/Superintendent Relationship" explicitly delegating "its executive powers" to the school superintendent. The policy explains:

> The Board believes that the legislation of policies is the most important function of the school board and that the execution of the policies should be the function of the Superintendent.
> Delegation by the Board of its executive powers to the Superintendent provides freedom for the Superintendent to manage the schools within the Board's policies and frees the Board to devote its time to policymaking and evaluation functions.
> The Board holds the Superintendent responsible for the administration of its policies, the execution of Board decisions, the operation of the internal machinery designed to serve the school programs, and for keeping the Board informed about school operations and problems.
> The Board shall strive to procure, when a vacancy exists, the best professional leader available for the chief administrative post.

App. 1870. It then concludes by describing the powers that the board agrees to extend to the superintendent, including a promise that "the Board . . . shall . . . [a]ct only upon the recommendation of the Superintendent in matters of employment or dismissal of school personnel." *Id.* A second policy, titled "Staff Hiring," makes the superintendent "responsible for developing selection procedures and recommending candidates to the Board." App. 2482. Following *Praprotnik*, we look primarily to two factors in deciding whether an official is a final policymaker within his area of authority: first, whether his "discretionary decisions are constrained by general policies enacted by others," and second, whether those "decisions are reviewable by others." *Dill v. City of Edmond*, 155

-17-

F.3d 1193, 1211 (1998) (internal quotation marks omitted).  Under these factors, we are not persuaded that the board's policies enact a delegation so final that the superintendent's "edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694.[6]

First, the board's policy explicitly provides that the superintendent's decisions are to be "constrained by general policies enacted by" the school board. *See Dill*, 155 F.3d 1211.  The superintendent is charged with "executi[ng]" only the policies "legislat[ed]" by the board, and the policy reiterates his duty "to manage the schools *within the Board's policies*."  App. 1870 (emphasis added).  The additional policy instructing him to develop selection procedures and make recommendations does not change this; like all of the superintendent's duties, it is subject to the general instruction that he implement the board's policies rather than creating his own.  The Fifth Circuit, confronting a similar distribution of executive and legislative power by a school board, has reached the same conclusion.  In *Barrow v. Greenville Independent School District*, 480 F.3d 377 (5th Cir. 2007) the court held that a superintendent's final power to make recommendations or personnel transfers did not make him the final policymaker over those personnel decisions.  The court noted its prior decisions that "under

---

[6] The board also argues that Wyoming law actually forbids delegations of authority over personnel matters from school boards to superintendents, an issue not clearly resolved by Wyoming case law.  Because we conclude that the district's policies do not attempt to delegate final policymaking authority, we do not need to resolve it here.

Texas law, school boards make policy and superintendents administer," *id*. at 380, and concluded that a superintendent's authority to *execute* policies did not make him the final policy*maker* for purposes of *Monell*. *Id.* at 381–82.[7]

Second, under the board's policies at issue in this case, the superintendent's hiring decisions "are reviewable by others." *Dill*, 155 F.3d at 1211. When the superintendent puts forward the candidates recommended by the committee, the board may decide not to hire them. If the board does not like the candidates the superintendent puts forward, it may demand new ones. This review prevents the superintendent from being a final policymaker.

The plaintiffs challenge this conclusion on two grounds. They argue that the policy providing that the board shall hire "only upon the recommendation of the Superintendent," App. 1870, gives him a final veto power over particular candidates (although in one case Mr. Dougherty actually supported one of the plaintiffs). Other circuits have rejected the argument that a potential ability to veto new candidates by failing to recommend them turns a school administrator into a policymaker, *see Barrow*, 480 F.3d at 381–82; *Adkins v. Board of Educ.*, 982 F.2d 952, 959 (6th Cir. 1993), and so do we. The ultimate authority to hire employees and to decide what rules govern hiring is retained by the board. The superintendent's power to recommend is simply a component of the board's hiring

---

[7] If anything, *Barrow* featured a closer case than is presented here, because the superintendent's "'sole authority' to recommend" came from state statute, not a policy adopted by, and therefore rescindable by, the board. 480 F.3d at 381.

power, not a separate source of district policy—indeed, the recommendation power has meaning only within the hiring system run by the board. Thus, any complaint about the superintendent's failure to properly recommend candidates to the board belongs in a suit against him personally, not the district.

Alternatively, the plaintiffs complain that in practice the board's supervision of the superintendent's role in the hiring process was so deferential that he was functionally unreviewed. But this appears to confuse the legal question of the locus of final decisionmaking authority with the factual question of how aggressively or independently the board tends to exercise the power it has. "If the board retains the authority to review, even though it may not exercise such review or investigate the basis of the decision, delegation of final authority does not occur." *Jantz*, 976 F.2d at 631. As a plurality of the Supreme Court put it in *Praprotnik*, "[s]imply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy." 485 U.S. at 130 (plurality opinion). Regardless of whether plaintiffs are right that the board did not aggressively supervise Mr. Dougherty's decisions, the board had the authority to do so. Whether it used it or not, that authority makes the board, not the superintendent, the proper target in a municipal liability suit. To hold otherwise and attempt to dig into the details of the board's supervisory activities in this case would be to make the "[un]justified . . . assump[tion] that municipal policymaking authority lies somewhere other than where the applicable law

purports to put it." *Id*. at 126. That would subject school boards to "capricious" review by federal juries for every municipal squabble. *Id*. at 124 n.1,

It is true that in analyzing this element of municipal liability in *Randle* we held that review must be "*meaningful*—as opposed to merely hypothetical." 69 F.3d at 449. This caveat must not be taken out of context, however. As we have explained, *Randle* did not attempt to repudiate the rule that policymaking authority is discovered by looking to the presence of legal authority rather than examining the facts of its exercise in a particular case. *Randle* held that the city council's *potential* ability to pass regulations making the city manager's decisions reviewable did not stop him from being a final policymaker, because no such regulations had been passed. *Id*. at 449–50. In other words, *Randle* requires us to look to the legal structure actually in place, not to imagine "hypothetical" review mechanisms that might exist if the legal structure changed. Analogously, we have held that the power of others to remove an official from his position does not necessarily keep him from being a final policymaker, because the "the power of ouster [i]s too general" to function as a mechanism of reviewing individual decisions, *Starrett v. Wadley*, 876 F.2d 808, 819 (10th Cir. 1989), just as the fact that a city council is elected does not keep it from being a city's final policymaker. However, we have never held a legally reviewable decision unreviewable for purposes of municipal liability merely because we were unsatisfied with the actual exercise of a board's oversight authority. That rule

would immerse us into fact-bound disputes about municipal politics and administration in nearly every case, the very approach rejected by *Jett*.

### C. Judgment as a Matter of Law

Because Superintendent Dougherty was not the final policymaker in Sheridan County School District No. 2, nothing remains of the plaintiffs' case against the district. The district appealed the district court's decision denying it judgment as a matter of law, which means we must decide whether—under the correct legal standard—the evidence at trial was sufficient for the jury to find that the school district itself had discriminated. *See Sims v. Great Am. Life Ins. Co.* 469 F.3d 870, 890–91 (2006) ("We review de novo a district court's denial of a motion for judgment as a matter of law, viewing the evidence in a light most favorable to the opposing party and drawing all reasonable inferences therefrom. . . . [I]f 'there is no legally sufficient evidentiary basis for a reasonable jury to find for the issue against that party' . . . we reverse a jury's verdict.") (quoting Fed. R. Civ. P. 50(a)(1)).

On appeal the plaintiffs do not argue that their claims can survive if neither Mr. Dougherty's conduct nor Mr. Burgess's can form the basis for municipal liability. *See* Aplee.'s Br. 35–45; *id.* at 36 ("[P]laintiffs' claim is a simple one: Dougherty and Burgess, through the authority of the superintendent's office, manipulated the hiring selection processes . . . to ensure that Hitt and Roberts were deprived of future employment as administrators in the District, and they did

this because of Hitt's and Roberts' sexual orientation."); *see also* App. 1751–52 (plaintiffs' closing argument) ("This case is about delegated authority. . . . Here my clients lost out, not because the board voted against them, but because Mr. Dougherty . . . violated my clients' rights."). Because this is the only ground on which the plaintiffs defend the judgment below, we conclude that the defendants' motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) should have been granted.

## III. QUALIFIED IMMUNITY

In addition to suing the school district under a theory of municipal liability, Ms. Milligan-Hitt and Ms. Roberts sued Mr. Dougherty in his personal capacity for the same actions discussed above. This portion of the suit faces a different obstacle, because Mr. Dougherty is a state actor shielded by qualified immunity. *See Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987); *Butz v. Economou*, 438 U.S. 478, 500–04 (1978). The district court dismissed the personal-capacity suit on a motion for summary judgment, finding that while the plaintiffs had alleged facts demonstrating that Mr. Dougherty's actions were unconstitutional, the law was not "clearly established," and therefore he could not be sued personally for damages. App. 104. Thus, the claims against Mr. Dougherty never went to trial, even though his conduct was the focus of the suit against the district. After the jury's verdict, the plaintiffs cross-appealed the grant of summary judgment in favor of Mr. Dougherty. They argue that the constitutional violation found by the

district court was a violation of clearly established law, and therefore that they ought to be permitted to proceed to trial against Mr. Dougherty himself. We disagree, and affirm the district court's grant of summary judgment.

### A. The Record and Appendix

At the outset, Mr. Dougherty argues that deficiencies in either the record on appeal or the appendix (he refers to each in his brief) prevent us from adequately reviewing the grant of summary judgment in his favor, and that we therefore must affirm without considering the merits. The plaintiffs respond that the record and appendix both contain all of the information necessary for us to decide their claim.

Because of the parties' confusion about the relationship between the appendix and the record, we wish to clarify. The record on appeal comprises all of "the original papers and exhibits filed in the district court; . . . the transcript of proceedings if any; . . . and a certified copy of the docket entries prepared by the district clerk." Fed. R. App. P. 10(a). However, in this Circuit we leave the record on appeal in the district court and rely primarily on an appendix that the parties are obligated to produce, containing the relevant parts of the record. 10th Cir. R. 30.[8] *See Travelers Indem. Co. v. Accurate Autobody, Inc.*, 340 F.3d 1118, 1121 (10th Cir. 2003) ("In this circuit the appendix often serves the purpose of

---

[8] This rule does not apply if parties have not retained counsel. 10th Cir. R. 30.1.

the record on appeal."). We sometimes refer to this appendix colloquially as the record on appeal, but technically it is not. The appellant's appendix must be "sufficient for considering and deciding the issues on appeal." 10th Cir. R. 30.1(A)(1). If the appendix is insufficient on an issue that the appellee wishes us to decide, he may file a supplemental appendix of his own. 10th Cir. R. 30.2(A)(1). If the appendix and its supplements are not sufficient to decide an issue, we have no obligation to go further and examine documents that should have been included, and we regularly refuse to hear claims predicated on record evidence not in the appendix. 10th Cir. 30.1(A)(3); *see, e.g.*, *Travelers Indem.*, 340 F.3d at 1121. However, we retain the *authority* to go beyond the appendix if we wish, because all of the transcripts (if they have been ordered)[9] and documents and exhibits filed in district court remain in the record regardless of what the parties put in the appendix. *United States v. Williams*, 511 F.3d 1044, 1044 n.1 (10th Cir. 2007).

We ordered the parties to this litigation to produce a consolidated appendix adequate to resolve both the appeal and the cross-appeal. *See* Order Clarifying Parties and Briefing, at 1–2 (Dec. 13, 2006). The bulk of the evidence in the

---

[9] Because the record automatically contains documents, exhibits, and transcripts, the major failure parties can make on appeal with respect to the record (as opposed to the appendix) is to neglect to order transcripts that are necessary to adequately consider an issue, *see* Fed. R. App. P. 10(b)(2), although we have sometimes ordered such transcripts on our own authority. *See, e.g.*, *McKinney v. Gannett Co.*, 694 F.2d 1240, 1241 n.1 (10th Cir. 1982).

appendix consists of the transcript of the trial against the school district. Mr. Dougherty wears two hats in this litigation—as personal defendant and as alleged policymaker for the school district—but evidence produced at the trial against the school district is not carried over into the personal capacity suit. Although the appendix contains the district court's summary judgment order, it does not contain the evidence that the court examined when it concluded that there was a material issue of fact as to whether the defendant had violated the Constitution. Mr. Dougherty argues that the plaintiffs should have included these materials from the record in the appendix, and that their failure to do so should cause us to affirm the district court's grant of summary judgment without confronting the merits. We disagree, and will resolve the plaintiffs' appeal.

The district court rendered two holdings in the course of granting Mr. Dougherty's summary judgment motion: one adverse to him (that he violated the Constitution) and one in his favor (that the constitutional rule he violated was not clearly established at the time). The plaintiffs asked us to reconsider only the issue they lost—whether the constitutional rule Mr. Dougherty allegedly violated was clearly established. The appendix they have provided is "sufficient for considering and deciding" that purely legal issue, 10th Cir. R. 30.1(A)(1), and indeed the plaintiffs' opening brief relies on no documents outside the appendix provided.

It is Mr. Dougherty who asks us to consider a second issue—whether the district court's assessment of the summary judgment record was correct when it decided that he violated the Constitution in the first place. Although he asks us to disagree with the district court, Mr. Dougherty may raise this argument without filing a cross-appeal because it is an alternative ground for affirming the judgment in his favor. *S. Utah Wilderness Alliance v. BLM*, 425 F.3d 735, 745 n.2 (10th Cir. 2005). However, the appendix is inadequate to consider the issue he raises, because we do not have the evidence the district court considered when deciding that Mr. Dougherty violated the Constitution. If the defendant wishes us to review the district court's conclusion that he violated the Constitution, he should have put evidence into the appendix that would allow us to review the challenged decision.

**B. Qualified Immunity**

Mr. Dougherty is accused of discriminating in violation of the Equal Protection Clause. Because he raised qualified immunity as a defense to the suit, the district court engaged in the famous two-step inquiry of *Saucier v. Katz*, 533 U.S. 194, 200 (2001), asking first whether he violated the Constitution, and second, if so, whether that violation was forbidden by clearly established law.[10]

---

[10] The Supreme Court has granted certiorari to decide "[w]hether the Court's decision in *Saucier v. Katz* should be overruled." *Pearson v. Callahan*, 76 U.S.L.W. 3510 (Mar. 24, 2008) (internal quotation marks and citations omitted), *granting cert. in Callahan v. Millard County*, 494 F.3d 891 (10th Cir.

The district court found that "the facts alleged show that Defendant Dougherty's conduct violated the Plaintiffs' constitutional rights." App. 102. The court's exact description of the conduct it found on summary judgment is slightly ambiguous, and it is particularly important because, as we have explained, we are taking this portion of the ruling as given. At one point the court concluded that the "evidence could be enough for a reasonable jury to find that the Defendants as a group—and Defendant Dougherty as an individual—were motivated by animosity towards homosexuals in their dealings with the Plaintiffs and that this animosity was a significant motivating factor in the adverse employment actions taken against the Plaintiffs." App. 103–04. The court did not find that the defendant had no reasons for his decisions that could constitute a rational basis. Later in its ruling, the court appeared to find that Mr. Dougherty had been motivated by "community notions of morality" expressed in the parent complaint. App. 109. The plaintiffs, who are cross-appealing, concede that any animus Mr. Dougherty had "could be attributed to 'community notions of morality,'" Cross-Aplt.'s Reply Br. 2, so we will treat the district court's ruling as a conclusion that the only bases for Mr. Dougherty's discrimination were "animus" and "community notions of morality."

---

[10](...continued)
2007). Because Mr. Dougherty has forfeited review of the first prong of the test, *Saucier*'s fate is not important to this appeal.

The court also concluded that in 2002 and the first half of 2003, neither the Supreme Court nor this Circuit had clearly established such discrimination to be unconstitutional. To determine whether the law was clearly established, *i.e.*, "whether it would be clear to a reasonable officer that his conduct was unlawful," we look to the relevant precedents at the time of the challenged actions and the obviousness of the violation in light of them. *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (internal quotation marks omitted); *see id*. at 1283–85. One purpose of qualified immunity is that we do not force public officials to guess—on pain of personal liability for damages—how the law will have developed by the time their actions are scrutinized in federal court. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus we offer no opinion on whether *Lawrence v. Texas*, 539 U.S. 558 (2003), decided after the events of this case, clearly established a rule of equal protection relevant here when it overruled *Bowers v. Hardwick*, 478 U.S. 186 (1986). Examining our cases interpreting *Bowers*, we conclude that at a minimum it was not reasonably clear that the discrimination alleged here was unconstitutional so long as *Bowers* was good law.

The district court relied on our decision in *Jantz v. Muci*, 976 F.2d 623, 628–30 (10th Cir. 1992), which upheld a qualified immunity defense for a school principal accused of refusing to recommend a new teacher and coach for a job at a Wichita high school on account of the applicant's homosexuality. We explained that "we d[id] not find a clearly established line of authority proscribing an

adverse action against civilian job applicants based on homosexual or perceived homosexual orientation." *Id.* at 629. We relied particularly on the Supreme Court's decision in *Bowers*, which upheld a state sodomy statute against a due process challenge, and which caused several circuits to conclude that because the state could criminalize homosexual conduct, it could also discriminate on the basis of homosexuality in other respects. *Jantz*, 976 F.2d at 629–30 (citing *Ben-Shalom v. Marsh*, 881 F.2d 454 (7th Cir. 1989); *Woodward v. United States*, 871 F.2d 1068 (Fed. Cir. 1989); *Padula v. Webster*, 822 F.2d 97 (D.C. Cir. 1987)). "Although the *Hardwick* Court did not deal with an equal protection claim," we acknowledged, "for qualified immunity purposes we think its holding, and the general state of confusion in the law at the time, cast enough shadow on the area" to cause us to uphold the defendant's qualified immunity defense. *Jantz*, 976 F.2d at 630.

Plaintiffs acknowledge the import of our ruling in *Jantz*, but argue that it became clear as early as 1996 that "government action that *discriminates* against homosexuals can[not] pass muster under the Equal Protection Clause merely because the community may disapprove of homosexuality," Cross-Aplt.'s Reply Br. 9, when the Supreme Court decided *Romer v. Evans*, 517 U.S. 620 (1996). We do not think *Romer*'s holding was so clear, and do not think it clearly overruled *Jantz*'s holding that municipal officials may sometimes defer to community standards when discriminating on non-suspect grounds.

*Romer* held that an amendment to the Colorado Constitution that would have "prohibit[ed] all legislative, executive or judicial action at any level of state or local government designed to protect" homosexuals violated the Equal Protection Clause. 517 U.S. at 624. In explaining why the amendment was unconstitutional, the Court noted that the amendment "defie[d] . . . conventional inquiry" because of "its sheer breadth" and its "peculiar property of imposing a broad and undifferentiated disability on a single named group." *Id.* at 632. These special features of the Colorado amendment justified the Court's conclusion that the amendment was "unprecedented," and therefore especially problematic. *Id.* at 633. *Romer* did not actually declare sexuality to be a "suspect" classification like racial classification, and did not indicate that discrimination on the basis of sexuality in other, more common, contexts would be judged with a similar stringency. Nor did the majority opinion overrule—or even mention—*Bowers v. Hardwick*, the precedent on which our opinion in *Jantz* relied. Because the case "defie[d] . . . conventional inquiry," the decision shed little light on the more conventional inquiry of *Jantz*.

This is not necessarily to minimize the impact of *Romer*; it is simply to say that *Romer*'s impact on prior precedent was not clear when it was decided. It is possible, as we have noted before, that the decision will ultimately "represent the embryonic stage[]" of a major change in doctrine. *Powers v. Harris*, 379 F.3d

1208, 1224 (10th Cir. 2004).[11]  But officials held personally liable for damages do not have to guess whether that is so before the courts decide it, and *Romer* does not reveal its own scope.  Because the constitutional rule at issue was not clearly established for the period relevant to this case, Superintendent Dougherty may not be held personally liable for damages.

## IV.  CONCLUSION

Because Mr. Dougherty lacked final policymaking authority, his alleged discrimination could not be a basis for municipal liability.  Because the law did not clearly forbid Mr. Dougherty's alleged actions at the time, he has qualified immunity from personal suit.  Thus, the judgment of the district court is

**REVERSED** as to the claim against Sheridan County School District No. 2 and

---

[11] Academic commentary by the decision's supporters confirms the ambiguity of *Romer*'s impact.  *See, e.g.*, William N. Eskridge, Jr., *Some Effects of Identity-Based Social Movements on Constitutional Law in the Twentieth Century*, 100 Mich. L. Rev. 2062, 2191 (2002) ("[*Romer*] is a mystery: the breadth of its reasoning could signal the full constitutionalization of gay people's politics of recognition, but the squirreliness of the state amendment renders the case potentially sui generis."); Pamela S. Karlan, *Some Thoughts on Autonomy and Equality in Relation to Justice Blackmun*, 26 Hastings Const. L.Q. 59, 67 (1998) ("In describing the Colorado provision as 'def[ying] . . . conventional inquiry' and 'confound[ing] [the] normal process of judicial review,' the Court implicitly refused to view its opinion as a template for future challenges to less unconventional forms of discrimination against gays and lesbians") (alterations and ellipsis in original; footnote omitted); Daniel Farber & Suzanna Sherry, *The Pariah Principle*, 13 Const. Comment. 257, 257 (1996) ("The decision also does not necessarily threaten most other restrictions on homosexuals . . . ."); Louis Michael Seidman, *Romer's Radicalism: The Unexpected Revival of Warren Court Activism*, 1996 Sup. Ct. Rev. 67, 73 ("No one can write confidently about what *Romer* 'means' because its ultimate meaning is yet to be determined by future judges and litigants.").

the official-capacity defendants and **AFFIRMED** as to the claim against Craig

Dougherty in his individual capacity.