FILED
United States Court of Appeals
Tenth Circuit

**July 10, 2009**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JERRY V. RIGGINS,

      Plaintiff-Appellee,

v.

BRUCE GOODMAN, JULIE BOYD,
and WILLIAM A. SIMMONS,

      Defendants-Appellants.

No. 08-1034

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 06-cv-2261-WYD-MJW)**

---

John R. Mann (Kevin P. Perez with him on the briefs) Kennedy Childs & Fogg,
P.C., Denver, Colorado for Defendants-Appellants.

Joseph A. Salazar, The Salazar Consultant Group, LLC, Thornton, Colorado for
Plaintiff-Appellee.

---

Before **HARTZ**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

    This case arises out of Jerry Riggins's termination from employment as a

police sergeant in Louisville, Colorado. Riggins asserted federal civil rights

claims against the City and several of its employees pursuant to 42 U.S.C. § 1983,

contending he was discharged without adequate procedural safeguards after he suffered from a psychiatric episode that caused him to take administrative leave for eight months. Riggins also brought a disability rights claim that is pending below and not the subject of this appeal.

The municipal defendants filed a motion for summary judgment on the due process claim, asserting qualified immunity. The district court denied the motion, and the defendants appealed. We conclude that the City's three-step appeals process provided adequate pretermination due process for Riggins to challenge the City officials' decision, and that the decision was not otherwise the result of a biased process.

Accordingly, we REVERSE.

## I. Background

Riggins was employed as a police officer with the Louisville, Colorado Police Department. In May 2004, he experienced a psychiatric episode in which he complained that someone was after him, his hotel room was bugged, and there was a computer chip implanted in his head. His wife reported the incident, and he was taken to a hospital and placed on mental health hold. As a result, Riggins was placed on administrative leave and relieved of his duties with the police department.

In September 2004, the City received from Riggins's psychiatrist a report that Riggins appeared to be able to return to work, but that he would recommend

a separate fitness for duty exam. In a later report, the doctor also indicated that he anticipated Riggins taking medications for at least another six months. He stated that if a patient discontinued his medications prematurely, he might risk a recurrence of his previous delusional symptoms.

The City referred Riggins to a psychologist for a fitness for duty determination. In November 2004, the psychologist examined Riggins and opined that he was psychologically fit to return to duty as a police officer. The psychologist cautioned, though, that "the public safety factors associated with [Riggins's] position require that his return be done in a carefully planned program with close supervision in order to monitor and assess his abilities to function safely and effectively as an officer." Aplt. App. at 162. Additionally, the City sought the opinion of a psychiatrist who advised caution in the resumption of duties for employees taking antipsychotic or antidepressant medications. That doctor submitted a report on January 6, 2005 questioning whether Riggins was ready to return to duty as a law enforcement officer.

After reviewing the various reports, Police Chief Bruce Goodman determined that Riggins was unable to resume his duties, and began proceedings to terminate Riggins. The City's policies provided that a department director "may impose dismissal upon the prior approval of the Human Resources Officer and City Administrator." Aplt. App. at 96. Accordingly, Goodman sent a memo on January 11, 2005 to the Human Resources Director and City Manager

-3-

explaining his reasons for recommending Riggins's termination. His memo concluded: that there were "several observations by [the examining doctors] that cause[d him] to believe that we do not know if Jerry no longer presents a threat to himself or others," Aplt. App. at 154; that the compulsory continued use of medications to prevent delusional symptoms indicates that Riggins's delusions remain possible if not probable; that "uncertainty is a very serious concern because we and his doctors will not know if he discontinues taking the medications"; and that despite Riggins having been a trustworthy and loyal employee for years, the unresolved public safety issues do not permit him to continue work as a police officer. *Id.* On January 20, 2005, the City Manager, William Simmons, and acting Human Resources Director, Julie Boyd, provided the requisite approval.

On January 26, 2005, Goodman sent Riggins a letter stating "[t]his letter is to advise you of the City's decision to terminate your position . . . effective . . . February 7, 2005." Aplt. App. at 86. "Your administrative leave without pay continues until the final outcome of any hearings you may request." *Id.* The letter also explained the administrative process available to contest the decision, including the opportunity for a hearing and the right to object to the "proposed termination" before a "final decision" would be made:

> As explained in Section Seven of your Employee Handbook, a department head may impose dismissal upon the approval of the Human Resources Officer and the City Manager. On January 11, 2005, I

recommended that action, and on January 20, 2005, the City Manager and Human Resources Officer approved your dismissal. *However, prior to a final decision regarding your employment, you may request a hearing with me, and you have the right to appeal my decision.* If you want to request a hearing, please submit that request to me in writing within five working days of the date you receive this letter. . . . At the hearing you will have the opportunity to explain or rebut the information presented, and to otherwise respond to the reasons for the *proposed* termination.

Aplt. App. at 86 (emphasis added). The letter further explained that following the hearing before Goodman—if one was requested—Goodman would make his "final decision"; that decision then would be subject to an appeal of right through the City's human resources department:

Following the hearing, I will make my final decision. You may appeal my decision to the City's Human Resources Officer through the appeal procedure outlined in Section Seven of your Handbook.

*Id.*

Goodman's letter outlined five reasons for Riggins's termination: (1) the lack of an unconditional, unqualified medical fitness for duty release; (2) the adverse and unknown effect of the prescribed medications on Riggins's ability to perform as a police officer; (3) the City's rejection of a therapist's opinion that Riggins was fit for duty based on that therapist's lack of expertise to make such a judgment; (4) the police department's inability to create and administer the "carefully planned program" recommended by the psychologist; and (5) "[n]one of the doctors know what caused the delusional episode or what may cause it to reoccur." *Id*. at 87–88. The letter continued, "[f]rom a public safety standpoint,

we can not endorse your being a police officer with the Department." *Id*. at 88. Goodman concluded: "this is the toughest personnel decision I have ever made." *Id.*

Goodman's letter triggered the City's three-step appeal process. Step one allows an employee to present his appeal to the department director (Goodman). If the grievance is not settled in step one, an employee has five working days, pursuant to step two, to forward the written grievance to the Human Resources Officer (Boyd), who will then meet with him. Finally, step three involves an appeal to the City Administrator (Simmons). The decision of the City Administrator is final and binding on the parties.

*Step One.* After receiving the letter, Riggins took advantage of the three-step appeals process by requesting an initial meeting with Goodman. Given this, his effective termination date was postponed pending the resolution of that process. The meeting with Goodman took place on February 8, 2005. At that meeting, Riggins, represented by counsel, offered evidence and an explanation in response to Goodman's January 26 letter. Among other things, Riggins claimed that he was ready to go back to work; he was not a threat to anyone; he had made great improvements; the "past is the past"; he had done everything he was asked to do; and with one exception, the doctors he had seen had cleared him for return to work. Riggins's attorney argued that the City would have less physiological testing data on a new recruit than on Riggins. He suggested flexibility in

Riggins's assignments, and phasing Riggins back into the organization. Riggins's counsel also contended that the City accommodates officers with diabetes, for example, and it should accommodate Riggins too.

After the meeting, Goodman decided his original recommendation should stand because Riggins provided insufficient information to mitigate the basis for termination.

*Step Two.* Riggins then pursued step two of the process by appealing Goodman's decision to the acting Human Resources Manager. Boyd conducted a hearing on April 22, 2005, again with Riggins represented by counsel. Riggins's counsel contended Riggins's regimen of medications had been successful, and Riggins was now able to perform his job. He also argued the City perceived a disability that was not present. Boyd inquired into whether Riggins had any indication of problems prior to the psychiatric episode, and Riggins informed her that he was not sure, and that he had been having trouble sleeping before the incident. Riggins indicated he was ready to return to work, and his counsel analogized Riggins's situation to that of an officer with diabetes whose chemical imbalance was resolved by medication.

After the hearing, Boyd recommended upholding Goodman's decision, based on her "concern for public safety." Aplt. App. at 118. She concluded "the stakes are too high and the risk too great for a tragedy to occur if Mr. Riggins is

working as a police sergeant in Louisville and suffers a recurrence of [a] delusional episode." *Id.*

*Step Three.* Finally, Riggins appealed to the City Manager under step three, who conducted a hearing on May 17, 2005. Riggins was again represented by counsel at this hearing. Riggins and his counsel argued that Riggins was ready to resume work; that with continued therapy and medication, he was symptom free; and that his attending physician and therapist said he can return to work.

The City Manager upheld Riggins's termination, stating "the City must base its decisions first and foremost on consideration of the public safety and welfare." *Id.* at 123. He notified Riggins of his decision in a letter dated May 24, 2005. The City Manager's decision was the last stage of the process, and under City policy was considered final and binding. Riggins's proposed termination, which had been postponed while the hearings took place, therefore became effective on May 24, 2005.

Riggins filed civil rights and disability claims against the City officials, including a § 1983 claim against Goodman, Boyd, and Simmons. He contends the defendants violated his due process rights because he was not afforded adequate pretermination due process and because of bias. The City officials requested summary judgment on qualified immunity grounds, but the district court denied that request. The City officials then brought this interlocutory appeal.

## II. Discussion

Riggins makes two arguments on appeal. First, he claims that the City officials failed to afford him adequate due process prior to discharging him. Second, he contends the City's decisionmakers were biased against him and had made up their minds before he had a chance to present his side of the story.

The City officials counter that they provided Riggins with a meaningful right to contest and appeal the proposed termination decision before termination became effective, and that the process afforded Riggins was fair and unbiased. They therefore claim Riggins can assert no due process violation and they are entitled to qualified immunity.

Qualified immunity entitles the defendant to avoid the travails of extended litigation, allowing interlocutory review of any "legal questions that arise from the denial of qualified immunity.'" *York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008) (citing *Perez v. Ellington*, 421 F.3d 1128, 1131 (10th Cir. 2005)). Although we lack jurisdiction to review the district court's rulings on the sufficiency of the evidence, *Wilkins v. DeReyes*, 528 F.3d 790, 797 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 1526 (2009), we nevertheless may determine whether a given set of facts violates a clearly established constitutional right. *Hesse v. Town of Jackson, Wyoming*, 541 F.3d 1240, 1244 (10th Cir. 2008).

Under the qualified immunity doctrine, "government officials performing discretionary functions, generally are shielded from liability for civil damages

insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[1] When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion. The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity. *Pearson v. Callahan*, 129 S. Ct. 808, 815–16, 818 (2009).

In this interlocutory appeal posture, we are limited to addressing legal questions. *York*, 523 F.3d at 1209. The question before us turns on an issue of law. For purposes of the appeal, we accept the facts as the plaintiff alleges them; however, the Supreme Court has held that qualified immunity is proper when the record plainly demonstrates no constitutional right has been violated, or that the allegations do not offend clearly established law. *See Scott v. Harris*, 550 U.S. 372 (2007).

The Supreme Court recently discarded a review process that required us to mechanically examine these questions sequentially, first considering whether a right had been violated, and then second—if we concluded a right had been

---

[1] We agree the defendants were acting in a discretionary capacity here. *See Harlow*, 457 U.S. at 816–18 (1982).

violated—whether that right was clearly established at the time of the alleged violation. *Pearson*, 129 S. Ct. at 816–22. *Pearson* retired this "rigid order of battle" approach, instead affording appellate courts discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

Riggins points to two constitutional violations, both based on the Due Process Clause: (1) denial of adequate due process before termination, and (2) denial of an unbiased tribunal. We address each in turn.

### A. Due Process Before Termination

To "assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir. 2004) (internal quotation marks and citation omitted). The City officials do not contest that Riggins enjoyed a protected property interest in his employment. The only question is the level of process to which he was entitled to protect that property interest.

"An essential principle of due process is that a deprivation of life, liberty or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542

-11-

(1985) (citation omitted).  The Supreme Court has described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."  *Id.* (citing *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis in original)).  "This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment."  *Id.* (citation omitted).

For government employees, such a hearing requires: (1) "oral or written notice [to the employee] of the charges against him"; (2) "an explanation of the employer's evidence"; and (3) "an opportunity [for the employee] to present his side of the story."  *Montgomery,* 365 F.3d at 936 (citing *Loudermill*, 470 U.S. at 546); *see also Langley v. Adams County*, 987 F.2d 1473, 1480 (10th Cir. 1993). "A full evidentiary hearing is not required prior to an adverse employment action."  *West v. Grand County,* 967 F.2d 362, 367 (10th Cir. 1992).  Instead, the "individual entitled to due process protection needs only to be given notice and an opportunity to respond."  *Id.*

We have upheld as sufficient to meet these requirements informal proceedings, such as pretermination warnings and an opportunity for a face-to-face meeting with supervisors, *see Seibert v. University of Oklahoma Health Sciences Center,* 867 F.2d 591, 598 (10th Cir. 1989), and even a limited  conversation between an employee and his supervisor immediately prior to the employee's

-12-

termination, *see Powell v. Mikulecky*, 891 F.2d 1454, 1459 (10th Cir. 1989). The objective of the process is "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *West*, 967 F.3d at 367 (citation omitted)).[2]

The City officials argue that under these cases, Riggins was entitled to notice of the proposed termination, an explanation of the evidence against him, and an opportunity to respond—all of which he received. *See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 521 (10th Cir. 1998). In response, Riggins contends the January 26, 2005 letter discharged him. He thus argues the hearings afforded to him took place after he was terminated and could not cure the lack of adequate pretermination process. But that is not the case. Riggins's allegations do not establish, on this record, that the City discharged him prior to the City Manager's hearing in May 2005.

As an initial matter, the process afforded to Riggins more than adequately satisfied due process requirements. Based on the City's policy, Riggins was

---

[2] Riggins is not contesting the availability or adequacy of the City's post-termination procedures. *Benavidez v. City of Albuquerque*, 101 F.3d 620, 626 (10th Cir.1996) ("When the pre-termination process offers little or no opportunity for the employee to present his side of the case, the procedures in the post-termination hearing become much more important."). Instead, Riggins argues that he was not afforded any pretermination process—that the only process he received was after his termination.

provided the opportunity for a three-step review process, pursuant to which he was given written notice of the charges against him, an explanation of the evidence, and several opportunities to present his side of the story.[3]  Our cases do not require a more elaborate process than that.[4]

For example, in *Powell*, we concluded that the pretermination process "accorded with the requirements established in *Loudermill*" when an employee was terminated *during* a meeting after he was asked and admitted to having had unauthorized communications. 891 F.2d at 1459.  Although Powell was not informed that he was under investigation prior to the meeting, we found that he received oral notice of the charges when he was confronted at the meeting, he admitted to the allegations, and he was not entitled to any pre-notification notice or to a delay between the notice and opportunity to respond.  *Id.*  Similarly, in

---

[3]  The district court found a genuine issue of material fact as to whether the defendants complied with all of the City's procedures.  Because the termination comported with constitutionally minimal due process, though, any allegation that the defendants failed to precisely follow City procedures is immaterial.  *See Ward v. Anderson,* 494 F.3d 929, 935 (10th Cir. 2007); *Hulen v. Yates*, 322 F.3d 1229, 1247 (10th Cir. 2003); *Hicks v. City of Watonga*, 942 F.2d 737, 746 n.4 (10th Cir. 1991) ("A failure to comply with state or local procedural requirements does not necessarily constitute a denial of due process; the alleged violation must result in a procedure which itself falls short of standards derived from the Due Process Clause." (citation omitted)).

[4]  In effect, it was as if Riggins was told, "I have made a recommendation that you will be discharged effective February 6 unless you can give us a good reason not to terminate you.  Here is how you can present your reasons why the proposed termination should not occur, and we will postpone the effective date of your termination while you provide these reasons."

-14-

*West*, we concluded the meetings and consultations in that case satisfied constitutional mandates when the totality of the circumstances indicated West knew in advance of her termination that the county attorney proposed to eliminate her job, and she had several pretermination opportunities to discuss her potential termination with the new county attorney and other county officials. 967 F.2d at 367–38 (emphasizing that "[p]laintiff was not fired out of the blue. Plaintiff was not fired for reasons that he did not know. Plaintiff was not fired without being given the 'opportunity to present his side of the story.'" (citing *Seibert*, 867 F.2d at 599)).

The record amply confirms the City officials extended Riggins these procedural rights. Goodman's January 26, 2005 letter notified Riggins that he had made an initial decision to terminate him, and informed him of the reasons for his termination and the basis for it. The letter also instructed him on his rights to appeal and identified the City's policies that allowed him to contest the "proposed" termination *prior* to his termination becoming effective. The letter stated that only *after* an appeal—if requested—would a "final decision" be made. Aplt. App. at 86. Riggins took advantage of these procedures, submitting testimony and documents through counsel. These procedures stemmed from the City's employee manual that plainly sets forth the process and advises that discharge will not occur until the culmination of the appeals.

While Riggins contends the letter constituted discharge, he ignores the plain language of the letter and the City policies which it references, asking us to construe them in a way that means the opposite of what they say.  The record is replete with language demonstrating the proposed termination was not final: "proposed termination"; "effective . . . February 7"; "prior to a final decision regarding your employment, you may request a hearing with me, and you may appeal my decision"; "following the hearing, I will make my final decision"; "you will have the opportunity to explain or rebut"; "the decision of the City Administrator at Step 3 will be final and binding on the parties"; "[p]rior to any final decision regarding dismissal, you will be given the opportunity to request a hearing before your department director."  Aplt. App. at 86, 96, 241.

In the face of this language, Riggins points to nothing that would support a contrary interpretation.  On the other hand, the parties' conduct after Goodman's letter confirms that both sides interpreted the letter to mean that Riggins could contest Goodman's initial decision before the proposed termination would become effective.  Riggins met with Goodman and marshaled arguments and evidence responding to the reasons set forth by Goodman as the basis for discharge.  During the appeal process, the City maintained him on administrative leave.[5]  And nothing in the record suggests that he was removed from the City's employee rolls or that

_____

[5]  Riggins does not claim that his administrative leave without pay triggers constitutional scrutiny.  His argument is based on the loss of his job.

-16-

the City took steps to discontinue his benefits or change his employment status until the conclusion of step three of the process. Due process requires nothing more.

It is true Goodman recommended to City officials that Riggins be terminated prior to sending the January 26, 2005 letter. But nothing requires a municipal employer to hold a hearing prior to the initial decision to terminate a position; rather, a hearing is required before employees are actually deprived of their jobs. That is, a hearing is required before the employee is "deprived of any significant property interest." *See Loudermill*, 470 U.S. at 542. In other words, due process is required not before the initial decision or recommendation to terminate is made, but instead before the termination actually occurs. *See Jackson v. St. Joseph State Hosp.*, 840 F.2d 1387, 1391 (8th Cir. 1988) ("Due process . . . does not require predecision hearings. It only requires an opportunity to be heard prior to the termination of benefits.").[6]

---

[6] Riggins points to several decisions in support of a contrary conclusion. We are not persuaded these cases apply here. In *Montgomery v. City of Ardmore*, 365 F.3d at 932, 935–36, for example, we found a due process violation when an employee on medical leave contacted his supervisor to inquire about returning to work, and he was informed that his employment had *already* been terminated, effective at an earlier date. In contrast, Riggins was provided with notice of his immediate supervisor's initial decision to terminate him and the reasons supporting that decision long before his termination became effective, and he was given an opportunity to present his side of the story and to appeal the decision before his proposed termination went into effect.

Similarly, in *Seibert v. University of Oklahoma Health Sciences Center*,
(continued...)

To hold otherwise would ignore the reality that supervisors make termination decisions for myriad reasons. A policy like the one here that allows for supervisors to make an initial recommendation to terminate based on certain charges, and to have a superior approve of that initial recommendation, provides more, not fewer, protections for public employees. However one characterizes them, the City's policies build in substantial protections for employees prior to the loss of jobs or benefits.

Finally, even assuming some lack of certainty existed as to the meaning of the January 26 letter and whether there was a constitutional violation concerning pretermination due process, qualified immunity would still be appropriate. Riggins cannot show that clearly established law rendered the process implemented by the City officials here unconstitutional. The notification of a decision to terminate at a future date along with the reasons for termination,

---

[6](...continued)
867 F.2d at 596–99, we found that although the employer's policy suggested a termination was not effective for several days, the employee lost his pay and benefits immediately upon notice, he was told "[a]s of now, you are terminated," and the employment policy defined the effective date of termination as the date of notice, so long as the employee did not succeed in the grievance process. Given that, we concluded the University's policies demonstrated, as a practical matter, that termination occurred as soon as the employee was given "notice of termination." *Id.*

This case is also distinct from *Lovingier v. City of Black Hawk*, No. 98-1133, 1999 WL 1029125 (10th Cir. Nov. 12, 1999), relied on by Riggins. There, the court found Lovingier had stated "a violation of the requirement clearly established by *Loudermill*" when his termination became effective "at the very moment he was given notice of the charges against him." *Id.* at *3.

-18-

followed by a three-step process designed to give several layers of review, does not offend clearly established law. *See Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) (explaining that qualified immunity shields officials from damages actions unless their conduct was unreasonable in light of clearly established law).

A right is clearly established when, at the time of the alleged violation, "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* A plaintiff can demonstrate that a constitutional right is clearly established by references to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits. *Id.* To determine whether the law was clearly established, we look to the relevant precedents at the time of the challenged actions and the obviousness of the violation in light of them; "we do not force public officials to guess—on pain of personal liability for damages—how the law will have developed by the time their actions are scrutinized in federal court." *Milligan-Hitt v. Bd. of Trs. of Sheridan County*, 523 F.3d 1219, 1233 (10th Cir. 2008). Moreover, "the plaintiff 'must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.'" *See Medina v. City of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992) (citation omitted). Although "the plaintiff need not show that the specific action at issue has previously been held unlawful, the alleged unlawfulness must be 'apparent' in light of preexisting law." *Id.* (citation omitted).

Applying these principles, no clearly established law would clearly advise the defendants that their conduct or implementation of the City's process here violated Riggins's due process rights. A reasonable city official would not conclude that these policies and the process afforded Riggins as set forth in Goodman's letter denied him the right to challenge the charges against him.

In conclusion, because the City officials afforded Riggins adequate procedural protections prior to the deprivation of his property interest in employment, he cannot assert a cognizable violation of a constitutional right or that the City officials violated clearly established law. The City defendants are therefore entitled to qualified immunity.

### B. Impartial Process

Riggins also contends the defendants violated his constitutional right to a fair tribunal because the City's decisionmakers were biased. He contends the City's investigatory and adjudicative functions were combined in the same personnel; he emphasizes that the same individuals approved the initial decision to terminate him and then presided over the hearings contesting the decision. He argues they had already made up their minds that he should be terminated prior to presiding over the hearings.[7]

---

[7] The defendants argue that Riggins waived the issue of bias by not objecting at the time of the hearing before the City Manager. Because we conclude Riggins has shown no partiality, we need not reach this argument.

-20-

Impartiality of the tribunal is an essential element of due process. *See Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975). We have held, though, that "a substantial showing of personal bias is required to disqualify a hearing officer or tribunal . . . ." *Corstvet v. Boger*, 757 F.2d 223, 229 (10th Cir. 1985). Indeed, a person claiming bias on the part of an administrative tribunal "must overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47. "Due process is violated only when 'the risk of unfairness is intolerably high' . . . there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated." *Hicks v. City of Watonga*, 942 F.2d 737, 746–47 (10th Cir. 1991); *see also Gwinn v. Awmiller*, 354 F.3d 1211, 1220 (10th Cir. 2004).

The role of city employees in the process with some knowledge of the matter does not ordinarily create concern. "Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not . . . disqualify a decisionmaker" and demonstrate actual bias. *Hortonville Joint School District No. 1 v. Hortonville Education Ass'n,* 426 U.S. 482, 493 (1976); *Mangels v. Pena*, 789 F.2d 836, 838 (10th Cir. 1986). Moreover, an administrative tribunal member is not disqualified because that member has "ruled strongly against a party" in a prior hearing or because he or she may have participated in the initiation of the proceedings. *Hicks*, 942 F.2d at 750–51.

In many small public agencies human resource personnel wear multiple hats. Thus, the "contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a . . . difficult burden of persuasion to carry." *Withrow,* 421 U.S. at 47. The fact "that [an agency] had entertained . . . views as the result of its prior ex parte investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject . . . ." *Id.* at 48, 56–58 (citation omitted). Thus, our case law generally rejects the idea that a combination of adjudicatory and investigatory functions is a denial of due process. *Id.* at 51, 56–58; *see also Hicks*, 942 F.2d at 748. Otherwise,

> almost anytime an employee in a small bureaucracy—where everyone knows everyone else—clashes with his superiors, the body elected to make disciplinary decisions will be constitutionally disqualified from doing so. This contravenes the Supreme Court's clear desire to leave such decisions in the hands of the bodies duly elected to make them.

*Hicks*, 942 F.2d at 748 (citations omitted). We also will not indulge a presumption against a public employer merely because of his ultimate personnel decision. *See id.*

Personal bias may be shown by prior statements going to the merits or animus that establish the decisionmaker cannot be fair. In *McClure v. Independent School District Number 16*, 228 F.3d 1205, 1215–16 (10th Cir. 2000), for example, bias was established where decisionmakers "publicly stated their intent to terminate [ ] McClure's employment prior to the hearing at which the matter of her

termination was to be decided." And in *Staton v. Mayes*, 552 F.2d 908, 914 (10th Cir. 1977), bias was shown when three of five school board members made statements prior to the hearing that the superintendent should be fired. We emphasized the "firm public statements before the hearing" by a defendant who publicized his pledge to seek a new administration and to change the superintendent, and who advertized that two other defendants had publicly said that no progress could be made without a new superintendent. *Id.* In those circumstances, "statements on the merits by those who must make factual determinations on contested fact issues of alleged incompetence and willful neglect of duty, where the fact finding is critical . . . left no room for a determination that there was a decision by a fair tribunal, with the appearance of fairness." *Id.* at 914–15.

Neither situation applies here. Riggins's evidence includes only his and his attorney's affidavits, with their statements of belief that the defendants were biased.[8] Riggins also refers to Goodman's initial decision to terminate Riggins, his request for approval to terminate Riggins, the Human Resources Director's and

---

[8] Riggins stated "I do not believe that Individual Defendants acted without bias or were impartial in deciding my termination appeal as they made the decision to terminate my employment prior to January 26, 2005." Aplt. App. at 168. His counsel stated: "I believe that the . . . memorandum and the January 24, 2005 e-mail from Defendant Boyd demonstrates that . . . Defendants made their decision to terminate [Riggins] *prior* to the January 26, 2005 termination letter . . . . ." *Id*. at 172 (emphasis in original).

-23-

City Manager's approval of Goodman's recommendation, and an email the Human Resources Manager sent to Goodman with a draft letter attached.

We see none of these allegations alone or together as creating an inference of bias to overcome qualified immunity.

First, Riggins's and his attorney's affidavits contain only conclusory allegations of bias. A complaint that contains "conclusory allegations of bias, without alleging factual support," however, is insufficient to establish a due process violation. *Tonkovich*, 159 F.3d at 520.

Beyond conclusory allegations, Riggins's claim relies on the fact that the same individuals made or approved the initial recommendation to terminate him and then presided over the hearings. But under our cases, that alone is insufficient to establish a constitutional violation. As we have explained, it is typical, especially in smaller jurisdictions, to combine investigatory and adjudicatory processes in one body. "[I]nvolvement of tribunal members in earlier proceedings in the same case does not overcome the presumption of honesty and integrity." *Hicks*, 942 F.2d at 748; *see also Withrow,* 421 U.S. at 46–52. And "'exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness' of a later adversary hearing." *Mangels*, 789 F.2d at 838 (citation omitted). Nor does procedural due process require access to professional hearing officers or hearing officers not employed by the governmental body or agency taking the adverse action. *Tonkovich*, 159 F.3d at 519–20.

Our cases, moreover, do not require a process where reviewing personnel are completely divorced from or blinded to the underlying nature of the reasons for dismissal.  In both *Staton*, 552 F.2d at 914, and *McClure*, 228 F.3d at 1216, the decisionmaker made statements going to the merits of the matter or which demonstrated animus before the due process hearing.  Riggins's allegations here, however, do not demonstrate any personal animus or bias with respect to the factual matters to be determined in the appeals process.  *Cf. McClure*, 228 F.3d. at 1216 ("[I]n *Hicks* [we] reiterated our holding that public statements by a decisionmaker prior to a termination hearing that demonstrate actual bias with respect to the factual matters to be adjudicated, raise a genuine issue of fact on a claim that a plaintiff was deprived of the right to an impartial tribunal." (citing *Hicks*, 942 F.2d at 746–48)).

In contrast, neither the Police Chief, the Human Resources Manager, nor the City Manager made statements demonstrating bias prior to the initial investigation or during the three-step process.  Rather, the record shows to the contrary.

Goodman followed City personnel policies by undertaking an extensive evaluation of Riggins's continued employment as a police officer, formulating a preliminary recommendation to terminate Riggins, and seeking the appropriate approvals necessary to implement his recommendation.  Goodman then notified Riggins that he had initially decided to terminate him, but also that Riggins had an

opportunity to convince him otherwise at a meeting before any decision would become final and before the proposed termination would go into effect.

To the extent Riggins complains that Goodman as Police Chief made the initial termination recommendation and then presided over Riggins's first pre-termination hearing, we see no constitutional problem. Riggins's allegations do not establish that Goodman was actually biased. The mere showing that a supervisor initially recommended a dismissal and then met with the employee prior to that employee's termination is ordinarily insufficient to establish a constitutional violation. *See West*, 967 F.2d at 368 (finding that a meeting with the supervisor, who ultimately terminated the employee, provided "sufficient notice and opportunity to respond to satisfy the pretermination due process requirements"); *see also Seibert*, 867 F.2d at 598–99 (finding that meetings with a foreman concerning plaintiff's insubordination which led to foreman firing plaintiff were sufficient to satisfy constitutional requirements). Moreover, Goodman's role was only to conduct an initial pretermination hearing; Simmons and Boyd presided over hearings after the hearing conducted by Goodman. *See* 2 Isidore Silver, Public Employee Discharge & Discipline § 17.06 (3d ed. 2001) ("The supervisor officiating at the [initial pretermination] meeting need not be impartial. Indeed, it is often assumed that the supervisor who best knows the charges (and who perhaps has even brought them) is the most appropriate initial decision-maker."); *see, e.g.*, *Locurto v. Safir*, 264 F.3d 154, 173–74 (2d Cir. 2001)

(collecting cases and concluding that a neutral adjudicator is not a necessary component of due process at a pretermination hearing, so long as the plaintiff is afforded a hearing before a neutral adjudicator after termination).

And although City policy required the Human Resources Manager and City Manager to initially approve the process going forward, these officials held subsequent proceedings where Riggins contested Goodman's recommendation. Those hearings allowed Riggins to challenge the recommendation and the basis for it, including the opportunity to present evidence and his own testimony. These City officials are entitled to a presumption of integrity, *Withrow*, 421 U.S. at 47, and Riggins does not overcome that. As explained above, exposure to evidence or involvement in nonadversary investigative procedures is insufficient in itself to impugn the fairness' of a later adversary hearing. *Mangels*, 789 F.2d at 838; *see also Hortonville*, 426 U.S. at 493; *Withrow,* 421 U.S. at 46–52, 56–58; *Hicks*, 942 F.2d at 748. At no time during these proceedings did Riggins or his counsel ever complain that the City personnel were not impartial. Rather, the record shows these officials had no "personal or financial stake in the decision that might create a conflict of interest, and there is nothing in the record to support charges of personal animosity." *Hortonville*, 426 U.S. at 492.

Under the circumstances, no clearly established law would advise reasonable decisionmakers that the appeals process and their role in it, as alleged

here, transgressed clearly established constitutional rights. *See Gann*, 519 F.3d at 1092; *Milligan-Hitt*, 523 F.3d at 1233.

In conclusion, Riggins's allegations do not establish a constitutional violation or that under clearly established law the City's appeals process and decisionmakers were biased. The defendants are therefore entitled to qualified immunity.

### III. Conclusion

Because we conclude that the defendants are entitled to summary judgment on qualified immunity grounds, we REVERSE.