**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 29, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RICHARD WAYNE JOHNSON,

    Plaintiff - Appellant,

and

TANYA JOHNSON,

    Plaintiff,

v.

CITY OF ROSWELL; ROSWELL
POLICE DEPARTMENT; JOSEPH
LANNOYE, in his individual capacity;
CRUZ ZAVALA, in his individual
capacity; ROBERT SWANTEK, in his
individual capacity; PHIL SMITH, Chief
of Police for the City of Roswell, in his
individual and official capacities,

    Defendants - Appellees.

No. 17-2176
(D.C. No. 2:15-CV-01071-GBW-CG)
(D. N.M.)

_____

**ORDER AND JUDGMENT***
_____

Before **LUCERO**, **HARTZ**, and **MORITZ**, Circuit Judges.
_____

---

* After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

In this excessive-force case, Richard Wayne Johnson appeals from a district-court order granting the defendants' motion for summary judgment. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

BACKGROUND

Almost all the relevant facts are undisputed. Johnson was shot by police outside his Roswell, New Mexico apartment on the evening of October 28, 2013. Earlier in the day, Johnson's brother-in-law, Matthew Capps, visited the apartment after arguing with Johnson on the phone. The argument apparently continued, as Johnson discharged his .22 caliber revolver inside the apartment because he had "had enough." Aplt. App., Vol. II at 411. The two men then left the apartment and went for a ride in Capps's car, where they argued some more. During the ride Johnson was armed with his revolver and a .22 caliber rifle.

Capps eventually parked the car in a church parking lot, where Johnson exited the vehicle and tried to get Capps out as well. Capps "somehow got" Johnson's revolver and hit Johnson on the head with it. *Id.* at 413. He then drove off with both of Johnson's guns, saying "he was going to the police." *Id.* Johnson eventually began walking home, with his head bleeding.

In the meantime, Capps arrived at the Roswell Police Department, covered in blood, and said he wanted to report a battery. An officer spoke with Capps and relayed to Sergeant Cruz Zavala that Johnson had asked Capps to kill him, that the two men had "struggle[d] over firearms" in a church parking lot, that a round had been fired toward the church, "and that [Capps] managed to take the firearms." *Id.* at 445. Zavala decided to

2

send officers to Johnson's apartment to validate Capps's information and check on Johnson's welfare.

Johnson arrived home, still angry with Capps. His wife tried to calm him down and said he needed to go to the hospital because he was "not right" and his "speech [wa]s slurred, other stuff from drinking [whiskey earlier in the day]." *Id.* at 414. But Johnson "want[ed] to get [his] . . . guns back first," saying that Capps had "stole[n] them." *Id.* at 415.

Sergeant Zavala and Officers Joseph Lannoye, Robert Swantek, and Grant Longberg arrived at Johnson's apartment complex. In addition to the information Zavala had obtained earlier, he had stopped at the church and discovered bullet damage to the building. Lannoye was aware that the subject of the welfare check was possibly intoxicated and suicidal and had been involved in an "assault and/or battery"; that "firearms were involved earlier" and a round had been discharged inside the apartment; and that "[t]here was a possibility of another firearm still in play at th[e] [apartment]." *Id.* at 433. Swantek had traveled to the scene with Lannoye. On the way, they spoke with Longberg about how "to handle [the situation]." *Id.* at 434.

At the apartment complex Lannoye surveyed the scene and sent Longberg to the back of the building to cover Johnson's patio. With Swantek and Zavala standing nearby, Lannoye knocked on the door and announced, "Roswell Police." *Id.* at 436. He could hear a male and female approaching the door and yelling, with the male sounding angry. Lannoye again knocked and announced the police presence. He was worried about the other officers getting caught in a crossfire and the possibility of a hostage inside the

3

apartment. The door opened quickly, and Johnson exited the apartment toward Lannoye with "a metallic object in his right hand." *Id.* at 438. Lannoye backed up, recognized the object as a firearm, and saw it "being raised in [the officers'] general direction." *Id.* at 438.

Zavala saw Johnson "rush[ ]" out of the apartment. *Id.* at 447. He noticed that Johnson was carrying a firearm, and he saw that "[i]t was coming up." *Id.* at 447, 448.

Upon seeing Johnson "walk[ ] out of his apartment" with a gun, Swantek retreated around the side of the building. *Id.* at 456. According to Swantek, the gun was raised, "point[ing] . . . [d]irectly at Sergeant Zavala and [him]." *Id.* at 457.

Fearing for his and the other officers' lives, Lannoye fired his rifle five times, seriously wounding Johnson. Lannoye's belt recorder picked up the following:

| OFFICER LANNOYE: | You guys ready? |
| (Knocking on door) | |
| OFFICER LANNOYE: | Roswell Police |
| MS. JOHNSON: | Please, don't |
| MR. JOHNSON: | Let's go, mother fucker. Come on . . . . |
| MS. JOHNSON: | . . . [D]on't. |
| MR. JOHNSON: | Get my . . . fucking gun. |
| OFFICER LANNOYE: | Roswell Police. |
| [Door Opening] | |
| MR. JOHNSON: | Where's my shit, mother fucker. |
| (five gunshots) | |

*Id.*, Vol. III at 523; *see also id.* at 522.

Johnson thought the person knocking on his door was Capps. He was both angry and frightened at Capps's apparent return, so he grabbed a revolver. He could not hear Lannoye's announcements. Johnson claims that when he opened the door and "quickly" stepped out, the gun "was at [his] side," and he did not point it at an officer. But he

4

admits that it was "plausible" that the gun "would raise up somewhat just by virtue of [his] walking out the door." *Id.*, Vol. II at 425.[1] Johnson believes the entire matter "happened from start to finish in a matter of about 15 to 20 seconds." *Id.*

Johnson filed a civil-rights and personal-injury action in New Mexico state court against the City of Roswell; the Roswell Police Department; Sergeant Zavala and Officers Lannoye and Swantek (in their individual capacities); and Police Chief Phil Smith (in his individual and official capacities). The case was removed to the United States District Court for the District of New Mexico, where Johnson amended his complaint. He sought recovery on a variety of theories, including: (1) excessive force against Lannoye, Swantek, and Zavala under 42 U.S.C. § 1983 and state law; (2) failure to properly train/supervise against Smith under § 1983 and state law; (3) negligence and assault/battery against Lannoye, Swantek, and Zavala; and (4) municipal liability against the City of Roswell under § 1983 and state law.

---

[1] Johnson testified as follows:

Q    Is it also true that, as you said that and took your steps out the door, your arms would swing back and forth? Is that right?
A    Yeah.
Q    Okay. So would it also be true, then, that as you're walking out the door and taking those steps, this right arm with the gun in it would raise up somewhat just by virtue of you walking out the door?
A    That's plausible.

Aplt. App., Vol. II at 425.

**DISCUSSION**

## I. Standards of Review

"We review the district court's summary judgment decision de novo, applying the same standards as the district court." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1046 (10th Cir. 2017). Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). Ordinarily, once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine triable issue. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

But where, as here, a defendant seeks summary judgment on the basis of qualified immunity, our review is somewhat different. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). First, "[t]he plaintiff must demonstrate on the facts alleged . . . that the defendant violated his constitutional or statutory rights." *Id.* Second, the plaintiff must show "that the right was clearly

established at the time of the alleged unlawful activity." *Id.* "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (internal quotation marks omitted).

## II.  § 1983 Excessive Force

Officers Lannoye and Swantek and Sergeant Zavala claim qualified immunity as a defense to Johnson's excessive-force claim.  As explained below, we agree because Johnson has not shown the violation of a constitutional right.

"When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (per curiam).  The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV.

We apply "a balancing test to determine when the use of force to effect a seizure is unreasonable." *McCoy v. Meyers*, 887 F.3d 1034, 1045 (10th Cir. 2018).  This requires weighing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted).  Proper considerations "includ[e] the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*  "Ultimately, the inquiry is always whether,

7

from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Pauly v. White*, 874 F.3d 1197, 1215 (10th Cir. 2017) (internal quotation marks omitted), *cert. denied*, 138 S. Ct. 2650 (2018).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Accordingly, determining whether a use of force was objectively reasonable must be accomplished without "the 20/20 vision of hindsight." *Havens v. Johnson*, 783 F.3d 776, 781 (10th Cir. 2015) (internal quotation marks omitted).

"The use of deadly force is justified if a reasonable officer in the defendant's position would have had probable cause to believe that there was a threat of serious physical harm to himself or to others." *Id.* at 781-82. (brackets and internal quotation marks omitted). "Thus, if threatened by a weapon . . . , an officer may use deadly force." *Id.* at 782 (brackets and internal quotation marks omitted).

Johnson maintains that Lannoye's use of deadly force was objectively unreasonable. Johnson points out that the officers were conducting only a welfare check and he was not a criminal suspect. He further states that "[h]e was a victim of a pistol whipping and . . . did not know it was police officers but thought it was [Capps who had] come back to hurt him some more." Aplt. Opening Br. at 15. But these observations fail to account for Lannoye's perspective. Lannoye knew that the subject of the welfare check was possibly intoxicated and suicidal, had been involved in an assault with

8

firearms, a round had been fired earlier inside Johnson's apartment, and a firearm might be accessible inside the apartment. Further, there was angry yelling inside the apartment. Lannoye could properly assume that anyone who heard the knock on the door also heard him announce "Roswell Police," particularly the second time, just before the door was opened. When Johnson quickly stepped out, carrying a gun in the "low ready position," Aplt. Br. at 10, with the gun moving up and down as he walked, it was reasonable for Lannoye to believe that Johnson posed a deadly threat and that the application of deadly force was necessary. Indeed, Johnson's own expert, DeWayne Goar, an experienced SWAT team supervisor, agreed, testifying in his deposition that looking at the brief period beginning when Johnson came out of his apartment, Lannoye acted reasonably in firing his gun and "did what he had to do in shooting Mr. Johnson." *Id.*, Vol. II at 465; *see also id.* at 470.

Johnson suggests, however, that all three officers violated his Fourth Amendment rights by creating the circumstances that necessitated Lannoye's use of deadly force. Johnson paraphrases Goar's opinion that "everyone should have slowed down, given better notice, not be[en] hasty, used less than lethal methods, use[d] some common sense[,] and not place[d] oneself in danger." Aplt. Opening Br. at 16.[2]

_____

[2] Goar consistently took issue with the conduct of the officers before Johnson left his apartment. *See, e.g.*, Aplt. App., Vol. II at 468 (opining by deposition that if the officers had used "other methods," the shooting "may not have occurred"); *id.*, Vol. III at 530 (opining by affidavit that "[t]he conscious decisions of the Officers to fail to attempt to communicate with Mr. Johnson, failure to take cover and concealment, failure to properly announce themselves loudly enough for Mr. Johnson to hear, sneaking up on Mr. Johnson in a clandestine manner, [and] failure to follow

(continued)

True, whether a use of force is reasonable includes "whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) (internal quotation marks omitted); *cf. Sutton v. Utah State School for Deaf and Blind*, 173 F.3d 1226, 1238 (10th Cir. 1999) ("[A]n act is reckless when it reflects a wanton or obdurate disregard or complete indifference to risk, and . . . reckless intent is established if the state actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences." (emphasis added)). But our focus remains on the totality of the circumstances; we consider "[o]nly events immediately connected with the actual seizure," *Jiron*, 392 F.3d at 415 (internal quotation marks omitted), and we do not employ 20/20 hindsight, *see Havens*, 783 F.3d at 781. While en route to Johnson's apartment, Lannoye, Swantek, and Longberg met to discuss how to conduct the welfare check. Once they arrived at Johnson's apartment complex, Lannoye surveyed the surroundings and sent Longberg to the back of Johnson's apartment. Lannoye and Swantek, along with Zavala, then approached Johnson's door, where Lannoye knocked and twice announced their presence. While there may have been safer ways to contact Johnson, no reasonable jury could find that the officers recklessly or deliberately created the need to shoot him. At most, the officers may have been negligent, but that is not a

intervention protocol for dealing with an intoxicated, suicidal, and/or mentally ill citizen constitutes reckless and deliberate conduct").

constitutional violation. *See Jiron*, 392 F.3d at 415. Thus, Officers Lannoye and Swantek and Sergeant Zavala are entitled to qualified immunity on Johnson's excessive-force claim.

Without a constitutional violation, Johnson's § 1983 failure-to-supervise/train claim against Chief Smith in his individual and official capacities also fails. *See Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 918 n.7 (10th Cir. 2012); *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). Similarly, without a constitutional violation the Roswell Police Department and the City of Roswell cannot be held liable under § 1983. *See Green v. Post*, 574 F.3d 1294, 1310 (10th Cir. 2009); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993). Johnson does not argue otherwise. "Issues not raised in the opening brief are deemed abandoned or waived." *Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997).

### III. Assault & Battery

The New Mexico Tort Claims Act (NMTCA) authorizes suits against law enforcement officers who commit assault or battery while acting within the scope of their duties. *See* N.M. Stat. Ann. § 41-4-12.[3] Under New Mexico law, "[f]or there to be an assault, there must have been an act, threat or menacing conduct which causes another

---

[3] To the extent Johnson brought an excessive-force claim under the New Mexico Constitution's prohibition against unreasonable seizures, *see* N.M. Const., art. II, § 10, he provides no discussion in his opening brief differentiating such a claim from his Fourth Amendment excessive-force claim. Both claims employ "a reasonableness standard," *Sisneros v. Fisher*, 685 F. Supp. 2d 1188, 1222 (D. N.M. 2010), and Johnson identifies no basis for us to decide his state constitutional claim differently from his federal constitutional claim.

person to reasonably believe that he is in danger of receiving an immediate battery." *Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1208 (10th Cir. 2006) (internal quotation marks omitted). "Battery occurs when an individual acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and an offensive contact with the person of the other directly or indirectly results." *Id.* at 1208-09 (ellipsis and internal quotation marks omitted).

In the performance of their duties, however, police officers are entitled "to use such force as [i]s reasonably necessary under all the circumstances of the case." *Mead v. O'Connor*, 344 P.2d 478, 479 (N.M. 1959). Thus, "[w]hen acting in good faith, the courts will afford them the utmost protection, and they will recognize the fact that emergencies arise when the officer cannot be expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court." *Id.* at 480. This presents an "objective standard of police conduct." *State v. Ellis*, 186 P.3d 245, 250 n.2 (N.M. 2008). Fourth Amendment jurisprudence, including *Graham*'s excessive-force analysis, is informative. *Id.* at 251. For the reasons discussed above regarding Johnson's excessive-force claim under § 1983, we conclude that no reasonable jury could return a verdict in his favor for assault or battery.

## IV. Negligence

The NMTCA permits a negligence action against a police officer, but "only to the extent that [the] . . . officer's negligence is alleged to have caused a third party to commit one of the . . . intentional torts" listed in N.M. Stat. Ann. § 41-4-12, such as assault or

12

battery.  *Lessen v. City of Albuquerque*, 187 P.3d 179, 187 (N.M. Ct. App. 2008).  For example, New Mexico recognizes claims like failure to train and supervise subordinate officers, *see Ortiz v. N.M. State Police*, 814 P.2d 117, 118 (N.M. Ct. App. 1991); but such a claim is viable only if the subordinate officer committed an intentional tort, because "immunity is not waived [under the NMTCA] for negligence standing alone." *Caillouette v. Hercules, Inc.*, 827 P.2d 1306, 1311 (N.M. Ct. App. 1992).  As Johnson has failed to demonstrate the existence of a triable issue of assault or battery, his claims against any defendant predicated on negligence necessarily fail.

## CONCLUSION

We affirm the district court's judgment.

Entered for the Court

Harris L Hartz
Circuit Judge